# FILED

August 24 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA



DA 09-0650

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2010 MT 188

IN RE THE MARRIAGE OF:

SCOTT DOUGLAS WEISS,

      Petitioner and Appellee,

  and

RAYNA MARICE WEISS,

      Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DR 08-1307 Honorable Ingrid Gustafson, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          Kenneth D. Tolliver, Matthew B. Gallinger, Tolliver Law Firm, P.C., Billings, Montana

      For Appellee:

          W. Corbin Howard, Attorney at Law, Billings, Montana

                Submitted on Briefs: June 9, 2010

                    Decided: August 24, 2010

Filed:

            _____
                         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Rayna Weiss appeals from that portion of the Findings of Fact, Conclusions of Law and Final Decree of Dissolution filed by the District Court for the Thirteenth Judicial District, Yellowstone County, giving her former husband, Scott Weiss, the ownership interest in DTS Logistics, LLC. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

¶2      Rayna raises three issues on appeal which we have restated and consolidated into the following two issues:

¶3      1.   Whether the District Court erred in allocating the 40% ownership interest in DTS Logistics, LLC to Scott based on the court's interpretation of the provisions of the parties' premarital agreement.

¶4      2.   Whether the District Court erred in determining that the $280,000 Rayna transferred to Scott in 2004 was an interest free loan.

## Factual and Procedural Background

¶5      Rayna and Scott met in 1990. At the time, Rayna was employed with the United States District Court Clerk's office in Billings as a deputy clerk. She owned her own home, was a participant in two federal retirement plans through her employment, and expected a substantial inheritance. Scott was employed with Diversified Transfer and Storage in Billings as a truck driver.

¶6      Prior to their marriage in July 1993, Rayna had her attorney draft a document entitled Agreement in Contemplation of Marriage (the premarital agreement). This premarital agreement provided that in the event of a divorce, anything separately held in

Rayna's name would go to Rayna and anything separately held in Scott's name would go to Scott. Scott signed the premarital agreement without making any changes, corrections or additions.

¶7 In 2000, Scott's employers formed DTS Logistics, LLC (DTS), a brokerage service that Scott was instrumental in developing. Scott was hired to manage DTS at a salary of $65,000 per year. In addition, Scott's employers offered to sell him a 20% ownership interest in DTS for $126,692. Scott purchased an initial 6.31% ownership interest with $20,000 provided by Rayna and $20,000 he had received as a gift from Rayna's parents. The remainder was purchased over time with earnings from the initial 6.31% ownership interest and from Scott's income. This ownership interest was held solely in Scott's name.

¶8 In 2004, Scott's employers offered to sell him an additional 20% ownership interest in DTS for $330,000. Scott purchased this interest with $50,000 from his 401(k) and $280,000 provided by Rayna for which Scott provided Rayna a "repayment forecast." All of these funds went into Scott's separate checking account. He then issued a check from his account to DTS to purchase this additional ownership interest. This interest was also held solely in Scott's name. Scott subsequently repaid Rayna the entire $280,000.

¶9 Scott petitioned for dissolution of the marriage in 2008. The District Court awarded each party the assets in their separate names and the parties stipulated to the division of jointly held property. The only issue of contention was the distribution of the 40% ownership interest in DTS. Scott contended that the entire 40% ownership interest

3

should be distributed to him because it was titled solely in his name and because the $20,000 he received from Rayna in 2000 was a gift, while the $280,000 he received from her in 2004 was a loan which he repaid in full. Rayna contended that, rather than being gifts or loans, she invested $300,000 in DTS, thus she is entitled to share in the proceeds in proportion to her investment.[1]

¶10 The District Court awarded the entire 40% ownership interest in DTS to Scott. In doing so, the court determined that the original $20,000 Rayna transferred to Scott to purchase the ownership interest was done as a gift to Scott. Regarding the remaining $280,000 that Rayna transferred to Scott, the court determined that there was an implied contract between Rayna and Scott for an interest free loan which Scott repaid in full prior to the dissolution of the marriage. Rayna appeals the court's determination.

**Standard of Review**

¶11 This Court reviews a district court's distribution of marital property to determine whether the district court's findings of fact are clearly erroneous. *In re Marriage of Baker*, 2010 MT 124, ¶ 22, 356 Mont. 363, 234 P.3d 70 (citing *In re Marriage of Williams*, 2009 MT 282, ¶ 14, 352 Mont. 198, 217 P.3d 67; *Bock v. Smith*, 2005 MT 40, ¶ 14, 326 Mont. 123, 107 P.3d 488). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Baker*, ¶ 22. Moreover, if we determine the district court's findings are not

---

[1] During the parties' marriage, the 40% DTS ownership interest generated $1.5 million in cash distributions. However, it is subject to restrictive shareholder agreements limiting any future sale of the ownership interest to the price Scott paid for it.

4

clearly erroneous, we will affirm the district court's distribution of marital property unless we find that the district court abused its discretion. *Baker,* ¶ 22. In addition, we will review a district court's conclusions of law to determine whether the court's conclusions are correct. *Baker,* ¶ 22 (citing *Williams,* ¶ 14; *In re Marriage of Bartsch,* 2007 MT 136, ¶ 9, 337 Mont. 386, 162 P.3d 72).

**Issue 1.**

¶12 *Whether the District Court erred in allocating the 40% ownership interest in DTS to Scott based on the court's interpretation of the provisions of the parties' premarital agreement.*

¶13 Rayna argues on appeal that the District Court erred in its interpretation of the premarital agreement and, consequently, its allocation of the entire DTS ownership interest to Scott. She maintains that the $300,000 she transferred to Scott was not a gift or a loan, but her personal investment in DTS and that, as a co-participant in the business with Scott, she is entitled to share in the proceeds in proportion to her investment.

¶14 Rayna asserts that under Article 13(4) of the premarital agreement, her mere delivery of cash to Scott cannot be transmutated into a loan without a notarized written document to that effect. She also asserts that pursuant to Article 9(1) of the premarital agreement, the separate property of each party together with its mutations must be restored to that party in the event of dissolution of the marriage, and that Article 9(2) of the premarital agreement requires that the ownership interest in DTS be divided between the parties according to each party's investment of their separate property in DTS. Rayna contends that because she put up more than 75% of the funds needed to purchase the

5

ownership interest in DTS, she should receive a proportionate share of the after-tax distributions received from DTS.

¶15 Scott argues that because the ownership interest in DTS is titled solely in his name, the District Court was correct in distributing it entirely to him under Article 4(1) of the premarital agreement. In addition, Scott maintains that rather than being Rayna's separate investment in DTS, the $280,000 was an interest free loan from Rayna while the $20,000 was a gift from Rayna. Scott asserts that Rayna transferred these funds from her sole and separate bank account to Scott's sole and separate bank account thereby divesting Rayna of any control or ownership over the funds.

¶16 Premarital agreements are authorized by statute in Montana. *See* Title 40, chapter 2, part 6, MCA (the Uniform Premarital Agreement Act). Specifically, § 40-2-605(1), MCA, authorizes parties contemplating marriage to agree in advance upon the disposition of their assets in the event of a divorce. In the case *sub judice*, the District Court determined that the premarital agreement was legally binding and controlled the distribution of assets and debts between the parties. Rayna and Scott agree that the premarital agreement is binding in this case, but each party relies on different provisions of the premarital agreement to support their arguments.

¶17 Rayna relies on Article 13(4) of the premarital agreement which provides:

> *Transmutation.* Property or interests in property now owned or hereafter acquired by the parties that by the terms of this Agreement are classified as the separate property of one of them can become the separate property of the other or the parties' joint property *only by a written instrument executed and acknowledged before a notary public* by the party whose separate property is to be reclassified. [Emphasis added.]

6

Thus, Rayna contends that her transfer of the $280,000 to Scott did not divest her of control of these funds because the transfer was done electronically not by "written instrument," and because it was not "executed and acknowledged before a notary public." We do not find Rayna's arguments persuasive.

¶18    Section 30-18-106, MCA, provides:

> **Legal recognition of electronic records, electronic signatures, and electronic contracts.** (1) *A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.*
> (2) A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.
> (3) If a law requires a record to be in writing, an electronic record satisfies the law.
> (4) If a law requires a signature, an electronic signature satisfies the law. [Emphasis added.]

Rayna instructed her bank to transfer $280,000 from her separate account to Scott's separate account. The fact that the transfer was done in electronic form rather than by check makes no difference. It was still a legally enforceable transfer of funds from her separate account to Scott's separate account thereby divesting Rayna of control over these funds.

¶19    As to the notarial requirement, Scott points out, and we agree, that the purpose of any notary requirement is to verify the authenticity of the signatory. Section 1-5-603(1), MCA ("In taking an acknowledgement, the notarial officer shall determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the officer and making the acknowledgement is the person whose true signature is on the instrument."). Here, Rayna does not dispute that she transferred these funds to Scott. Rather, she disputes that the funds could be considered as either a loan or a gift to Scott

rather than her investment as a co-participant with Scott in DTS. However, while Article 13(4) of the premarital agreement requires a "written instrument executed and acknowledged before a notary public," Article 13(3) of the premarital agreement provides that voluntary conveyances only need to have the instrument of conveyance or the document of title signed by the transferring party.

¶20 And, contrary to Rayna's assertions that she was part owner with Scott of the 40% ownership interest in DTS, Article 14(19) of the premarital agreement provides that joint business ventures can only be created by the execution of a separate, written document:

> *No Intention to Create Business Association.* It is not the intention of either party to form a joint venture, partnership, or other business association in which the parties would be co-owners of any property owned individually by either party. Each party expressly negates the existence of any such joint ventures, partnerships, or business associations and agrees that *any such arrangement may be created only by the execution of a separate, written document expressly acknowledging the formation of such arrangement and specifically delineating the rights of each party to such arrangement.* Each party further acknowledges that it is not their intent to take any action which would create a claim of ownership or reimbursement rights on the theory of constructive trust, resulting trust, or any other equitable or legal theory. Accordingly, each party waives the right to bring any legal proceeding alleging ownership or reimbursement rights under any legal or equitable theories, specifically including, but not limited to, constructive trust, resulting trust, partnership, joint venture, or business association. [Emphasis added.]

No document exists that satisfies the requirement to show that this was a joint business venture. Instead, Scott testified that he gave Rayna a repayment schedule for the $280,000 loan before she made the transfer and that each time he made a payment on the loan, he printed a new copy of the computer spreadsheet for Rayna showing his payments and the balance remaining on the loan.

8

¶21 Rayna offered a "sticky note" containing the notation "R & S" along with some figures claiming that this evidenced a joint business venture between her and Scott. The note, however, did not describe with particularity any joint business venture since it did not set forth any terms or conditions of a joint business venture, it did not contain a date, nor was it signed by either party. The District Court quite correctly determined that the sticky note could not be considered a "written document expressly acknowledging the formation of" a joint business adventure pursuant to Article 14(19) of the premarital agreement.

¶22 Scott maintains that Rayna accepted the payments made by him in repayment of the loan and that she did not assert that the $280,000 was anything other than a loan until he filed for dissolution of their marriage. Scott also introduced into evidence at trial the deposition of Rayna's financial planner wherein he testified that when Rayna met with him in December 2005 to discuss her investments, rather than advising him that she had invested in DTS, she reported that she had given Scott money to purchase an interest in the business and that Scott was now paying her back.

¶23 Scott also points out that not only was the DTS ownership interest titled solely in his name, but that Rayna never took any role in DTS. She never gave DTS money; she did not help in the office; she never demanded or received any profit and loss statements for DTS; and she never demanded or received any profits or distributions from DTS.

¶24 Therefore, we hold that the District Court was correct in concluding that the $280,000 Rayna transferred to Scott in 2004 was a loan and not Rayna's personal investment in DTS.

¶25     We further hold that the $20,000 Rayna transferred to Scott in 2000 was a gift. We reiterate that Rayna transferred these funds from her sole and separate bank account to Scott's sole and separate bank account thereby divesting Rayna of any control or ownership over the funds. No repayment schedule for this amount was ever executed and no consideration was requested by Rayna. Section 70-3-101, MCA, defines a "gift" as a "transfer of personal property made voluntarily and without consideration." And, according to Article 9(2) of the premarital agreement: "Gifts from one party to the other shall be treated as the sole and separate property of the donee." The cases Rayna relies on in support of her argument that the $20,000 was not a gift, *Malek v. Patten*, 208 Mont. 237, 678 P.2d 201 (1984) and *Anderson v. Baker*, 196 Mont. 494, 641 P.2d 1035 (1982), are distinguishable from the instant case because both *Malek* and *Anderson* dealt with deposits made to *joint* checking and savings accounts.

¶26     The District Court determined that the provision that controls the distribution of the ownership interest in DTS is Article 4(1) of the premarital agreement which provides, in pertinent part:

> *Separate Property.* The parties do not intend to share together in the ownership of any property owned by either party, unless otherwise specifically conveyed by one to the other or by one to the parties jointly. Each party agrees that *all property, of whatever nature, shall be owned by the party having title to such property.* [Emphasis added.]

The court determined that under this provision, the 40% ownership interest in DTS should be allocated to Scott since it is titled solely in his name. To that end, the court stated: "The membership interest in DTS is titled to Scott. This is clearly reflected in DTS's tax returns and the K-1's issued to Scott on an annual basis."

10

¶27 The premarital agreement in this case contains contrary provisions creating an ambiguity. And, while Article 14(13) of the premarital agreement provides that "[n]o provision of this Agreement is to be interpreted for or against any party because that party or that party's legal representative drafted the provision," this provision is contrary to Montana law. Section 28-3-206, MCA, provides:

> **Uncertainty to be resolved against party causing it.** In cases of uncertainty not removed by parts 1 through 5 of this chapter, *the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.* The promisor is presumed to be such party, except that in the case of a contract between a public officer or body, as such, and a private party, it is presumed that all uncertainty was caused by the private party.

Consequently, any ambiguity in the premarital agreement must be resolved against Rayna since it was her attorney that drafted the premarital agreement. *Matter of Estate of Flasted*, 228 Mont. 85, 92, 741 P.2d 750, 754 (1987).

¶28 In this case, with the exception of the property that the parties stipulated to, the District Court followed Article 4(1) of the premarital agreement to distribute the marital property to the party having title to such property. Based on the foregoing, we see no reason that the 40% ownership interest in DTS should be treated any differently.

¶29 Accordingly, we hold that the District Court did not err in allocating the 40% ownership interest in DTS to Scott based on the court's interpretation of the provisions of the parties' premarital agreement.

**Issue 2.**

¶30 *Whether the District Court erred in determining that the $280,000 Rayna transferred to Scott in 2004 was an interest free loan.*

11

¶31 In Montana, there is a statutory presumption that any advance of money is presumed to be made on interest unless otherwise expressly stipulated in writing at the time of the loan.

> **Loan presumed to be on interest.** Whenever a loan of money is made, it is presumed to be made upon interest *unless it is otherwise expressly stipulated at the time in writing*.

Section 31-1-103, MCA (emphasis added).

¶32 Scott contends that because there was a written schedule of repayment that did not include interest, § 31-1-103, MCA, does not apply. But, Scott fails to take into account that neglecting to include interest in the repayment schedule is not the same as expressly stipulating that the loan does not include interest. Because there is no evidence in the record that the loan was to be interest free, § 31-1-103, MCA, does apply.

¶33 And, absent an express provision to the contrary, the rate of interest is determined by § 31-1-106(1), MCA, which provides in part:

> [U]nless there is an express contract in writing fixing a different rate or a law or ordinance or resolution of a public body fixing a different rate on its obligations, interest is payable on all money *at the rate of 10% a year* after it becomes due . . . . [Emphasis added.]

¶34 Accordingly, we hold that Rayna's loan of $280,000 to Scott was not interest free, and we remand to the District Court for calculation of interest at the rate of 10% a year from the date Rayna first transferred the funds to Scott until the amount was paid in full.

¶35 As a final matter, Scott has requested that we award him his attorney's fees and costs for responding to Rayna's "frivolous arguments." Because Rayna prevailed on the

12

issue of interest, her appeal is not frivolous and we decline to award attorney's fees. M. R. App. P. 19(5).

¶36 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE